2005 SD 99

**TOWN SQUARE LIMITED PARTNERSHIP, a South Dakota Limited Partnership, Plaintiff and Appellant,**

v.

**CLAY COUNTY BOARD OF EQUALIZATION, Defendant and Appellee.**

**505 W. Main Limited Partnership, Plaintiff and Appellant,**

v.

**Clay County Board of Equalization, Defendant and Appellee.**

**Nos. 23125, 23126.**

Supreme Court of South Dakota.

Considered on Briefs on Oct. 4, 2004.

Decided Sept. 21, 2005.

---

Thomas K. Wilka of Hagen, Wilka & Archer, PC, Sioux Falls, South Dakota, Attorneys for plaintiffs and appellants.

Tami Maroney Bern, Clay County State's Attorney, Vermillion, South Dakota, Attorney for defendants and appellees.

KONENKAMP, Justice.

[¶ 1.] In this property tax appeal, we address the valuation of an apartment building operating under the Federal Low Income Housing Tax Credit (LIHTC) program. The question is whether the "true and full value" of this low-income housing property must be calculated using market rent rates or whether the actual reduced rents should be used, and if the latter, whether the tax credits should also be included in the valuation. We conclude that both the restricted rents and the tax credits must be considered when assessing the property. Because these components were not accounted for in the assessment, we reverse and remand.

### Background

[¶ 2.] Town Square Limited Partnership owns two apartment buildings in Vermillion, South Dakota. One building has thirty rental units and the other, forty. In this consolidated appeal, the owners challenge the tax assessments imposed by the Clay County Board of Equalization on the thirty-unit building for the years 2001 and 2002. By agreement of the parties, consideration of the forty-unit apartment building was held in abeyance. The thirty-unit apartment complex was designed to house elderly and disabled residents. It was still under construction on November 1, 2001, and at that time, the building was eighty percent complete. On January 29, 2002, the City of Vermillion issued a certificate of occupancy, but the building did not have occupants until July 2002, and was not fully occupied until December 2002.

[¶ 3.] Congress enacted the Low Income Housing Tax Credit (LIHTC) to address the nationwide undersupply of affordable housing for low-income people. *See* 26 USC § 42. By creating equity capital through federal tax credits, this program indirectly subsidizes the purchase, construction, and rehabilitation of low income housing. *See* Sagit Leviner, *Affordable Housing and the Role of the Low Income Housing Tax Credit Program: A Contemporary Assessment*, 57 TAX LAW 869 (2004) (citation omitted). In allocating federal tax credits to developers of low cost rental housing and thus reducing investor federal tax liability, the LIHTC grants incentives for private construction. Without these incentives, affordable housing for low income individuals might well become increasingly unattainable. David Philip Cohen, *Improving the Supply of Affordable Housing: The Role of the Low–Income Housing Tax Credit*, 6 JL & POL'Y 537 (1998).

[¶ 4.] The LIHTC program is administered by the Department of the Treasury through local state agencies. Our state's official "housing credit agency" is the South Dakota Housing Development Authority. It is responsible for the administration and allocation of South Dakota's tax credits. 26 USC § 42(m). The program offers a ten-year reduction in tax liability for owners of low-income rental housing based on the development costs. Credit-financed apartments cannot be rented to anyone whose income exceeds sixty percent of the area's median gross income. "Under the program, nonprofit organizations form partnerships with for-profit entities [to permit] private equity to reach the project while allowing the project's tax credit allocation to pass through to the for-profit limited partner." Jonathan Penna, *Fairness in Valuation of Low–Income Housing Tax Credit Properties: An Argument for Tax Exemption*, 11 J AFFORDABLE HOUSING & CMTY DEV L 53 (2001).

[¶ 5.] Town Square qualified under the program to receive total tax credits of $1,592,630, i.e., $159,263 a year for ten years. Each one-bedroom unit has a rent limitation of $375 per month. If the owners comply with the LIHTC restrictions, tax credits are awarded per unit. The project was structured to require that all the units be occupied by low-income tenants. Failure to comply with the restrictions can trigger recapture of tax credits. Even though the tax credits are only available for ten years, the agreement with the South Dakota Housing Development Authority requires a forty-year restrictive covenant on the apartment building encompassing both income restrictions in eligibility for occupancy and in requirements for charging reduced rents.

[¶ 6.] Clay County's assessment of the thirty-unit Town Square apartment for November 1, 2001 was $1,189,543, and, for November 1, 2002, $1,251,808. When Town Square protested, the county conceded that the assessments were incorrect. Town Square insisted that the assessment should have been $255,000 for November 1, 2001, and $625,000 for November 1, 2002.

[¶ 7.] To obtain a professional appraisal, Clay County hired Steven Shaykett, a certified real property appraiser. Shaykett used the three required statutory approaches to determine value: cost, market, and income. SDCL 10–6–33. But he concluded that the "greatest weight and reliability [should be] given to the income capitalization approach." Under this approach, he gave alternative appraisals. The first used market rents; the second, restricted rents. In his final opinion, however, he recommended that only market rents should be used. He also concluded that the value of the tax credits should not be considered because they are

"intangibles." Using market rents, Shaykett appraised the property at $732,640 as of November 1, 2001, and $910,000 as of November 1, 2002. Town Square's appraiser, Ritch LeGrand, considered the three required approaches to valuation and, like Shaykett, favored the income approach. Unlike Shaykett, however, he used only the reduced rents required to be charged and appraised the property at $255,000 as of November 1, 2001, and $625,000 as of November 1, 2002. LeGrand gave no consideration to the tax credits in his assessment.

[¶ 8.] When Clay County declined to reduce its assessments, Town Square appealed to the circuit court. During trial, it asked the court to apply the discretionary formula under SDCL 10–6–35.2. But the court found that Town Square had failed to introduce a copy of the county ordinance providing for the application of the discretionary formula. In so ruling, the court noted that it "can take judicial notice of the laws of the State of South Dakota but the laws or ordinances of sister states, foreign jurisdictions and municipalities must be proven." After trial, the court ruled that "Shaykett's appraisal . . . most accurately reflects the value of the subject property." As to the reduced rents, the court held that Town Square "artificially reduced the income of the subject property by participation in LIHTC, [thus] it is not appropriate to use the actual income of the complex to calculate value."

[¶ 9.] Town Square now appeals, questioning (1) whether the county used the proper methodology in assessing the apartment building; and (2) whether the property should be assessed under the discretionary formula in SDCL 10–6–35.2.[1]

### Analysis and Decision

[¶ 10.] Under Article XI, Section 2, of the South Dakota Constitution, "[t]axes shall be uniform on all property of the same class, . . . and the valuation of property for taxation purposes shall never exceed the actual value thereof." Significant to this case, the same constitutional section also states, "[t]axes may be imposed on any and all property. . . . Gross earnings and net incomes may be considered in taxing any and all property. . . ." *Id.* By statute, "[a]ll property shall be assessed at its true and full value in money." SDCL 10–6–33. In turn, SDCL 10–6–1(6) defines "true and full value" as "the usual cash selling price at the place where the property to which the term is applied shall be at the time of the assessment." The methods required to calculate full and true value are set forth in SDCL 10–6–33:

> The true and full value shall be determined by appropriate consideration of the cost approach, the market approach and the income approach to appraisal.

---

1. We examine these issues under a well-settled review standard:

    This court's proper [standard] of review of a trial court's decision in a trial de novo of an assessment matter is whether the decision of the trial court was "clearly erroneous." When applying the clearly erroneous standard, the question is not whether this court would have made the same findings that the trial court did, but whether on the entire evidence this court is left with a definite and firm conviction that a mistake has been committed.

    *Amert v. Lake County Bd. of Equalization,* 1998 SD 66, ¶ 14, 580 N.W.2d 616, 618 (quot-

ing *Richter Enterprises, Inc. v. Sully County,* 1997 SD 61, ¶ 7, 563 N.W.2d 841, 843 (quoting *Hutchinson County v. Fischer,* 393 N.W.2d 778, 781 (S.D.1986) (citations omitted))). For tax purposes, the valuation of property is a question of fact. *West Two Rivers Ranch v. Pennington County,* 1996 SD 70, ¶ 6, 549 N.W.2d 683, 685–86 (quoting *Lincoln Twp. v. South Dakota Bd. of Equalization,* 1996 SD 13, ¶ 24, 543 N.W.2d 256, 259). Of course, we review questions of statutory interpretation and other legal questions under the de novo standard. *Fall River County v. South Dakota Dep't of Rev.,* 1999 SD 139, ¶ 15, 601 N.W.2d 816, 821 (citations omitted).

The director of equalization shall consider and document all elements of such approaches that are applicable prior to a determination of true and full value.

Full and true value is "the price in money that property will bring in a competitive and open market under all conditions requisite to a fair sale between a willing buyer and a willing seller. . . ." SDCL 10–6–1.3; *Tax Appeal of Brookings Assoc. v. South Dakota State Bd. of Equalization*, 482 N.W.2d 873 (S.D.1992); *Yadco, Inc. v. Yankton County*, 89 S.D. 651, 237 N.W.2d 665 (1975). In assessing true value, the appraiser has the duty "to use all of those techniques and facts which accurately reflect 'full and true' value and to reject those which do not." *Yadco*, 237 N.W.2d at 667 (citing *Tidball v. Miller*, 72 S.D. 243, 32 N.W.2d 683 (1948)).

[¶ 11.] In this case, both sides agreed that the income capitalization approach was the most reliable method for determining the true value of the Town Square apartment building. The circuit court implicitly accepted that method when it upheld Shaykett's assessment and therefore we concentrate our analysis on the income approach.

### Assessment of Property in the Federal "LIHTC" Program

[¶ 12.] Town Square argues that the actual restricted rents, rather than hypothetical market rents, should be the measure used in the income capitalization approach. The larger question, however, is whether either or both the reduced rents and the tax credits should be used in the assessment of LIHTC properties. Neither side cites a South Dakota statute or regulation dealing with this specific question. Several other states have addressed the issue either through court decisions or legislation. Before we examine out-of-state decisions, we must take caution to note that these cases might have limited value as precedent because they have often been decided on constitutional and statutory provisions incompatible with our own state's provisions.[2]

[¶ 13.] Generally, our sister states are divided. But a clear majority of courts have ruled that the restricted rents must be taken into account when assessing LIHTC property. Only a few courts have ruled, like the circuit court here, that the use of the reduced rents is improper because a voluntary agreement by a developer to be bound by the restricted rents is not a "government restriction" requiring consideration of the lower rents. In the *Matter of Appeal of The Greens of Pine Glen Ltd. Partnership*, the court reasoned that "[u]nlike a governmental restriction such as zoning, [LIHTC] restrictions do not diminish the property's value, but instead balance tax credits allowed to the developer against rent restrictions imposed on the developer," and "[b]ecause [LIHTC] restrictions are freely entered contractual covenants, not governmental regulations," the "taxpayer may not artificially alter the value of [the] property below fair market value." 356 N.C. 642, 576 S.E.2d 316, 322 (2003). *See also Alliance Towers Ltd. v. Bd. of Revision*, 37 Ohio St.3d 16, 523 N.E.2d 826 (1988) (market rental rates should be used; artificial effects of government housing assistance

---

**2.** A number of states have addressed this issue by legislation. By statute Georgia prohibits the consideration of tax credits. Ga.Code Ann. § 48–5–2(3)(B.1) (2003). Illinois amended its tax laws to exclude LIHTCs from the definition of real property. 35 Ill. Comp. Stat. Ann. 200/1–130 (1999) ("Not included therein are low-income housing tax credits authorized by Section 42 of the Internal Revenue Code, 26 U.S.C. 42."). Wisconsin specifically prohibits assessors from considering LIHTCs. Wis. Stat. § 70.32(1g) (2004) ("the assessor may not consider the effect on the value of the property of any federal income tax credit that is extended to the property owner under section 42 of the Internal Revenue Code").

programs are not indicative of real estate valuation).

[¶ 14.] Several courts hold, in line with what Town Square contends, that the restricted rental rates should be used without consideration of the tax credits or other subsidies. *Cottonwood Affordable Housing v. Yavapai*, 205 Ariz. 427, 72 P.3d 357 (Tax 2003) (tax credits are nontaxable intangibles); *Greenfield Village Apartments, L.P. v. Ada County*, 130 Idaho 207, 938 P.2d 1245 (1997) (property valuation should consider restrictions on rent; concurring opinion argues that valuation should also include benefits of the tax credits); *Maryville Properties, L.P. v. Nelson*, 83 S.W.3d 608 (Mo.Ct.App.2002) (restricted rents must be taken into account, but tax credits cannot be considered); *Cascade Court, L.P. v. Noble*, 105 Wash.App. 563, 20 P.3d 997 (2001) (same); *Metro. Holding v. Milwaukee Review Bd.*, 173 Wis.2d 626, 495 N.W.2d 314 (1993) (property assessment for low-income housing should be based on actual rents and expenses—not addressing tax credits). Town Square insists that tax credits are not taxable under South Dakota law because they are intangibles.

[¶ 15.] Indeed, some of these out-of-state decisions hinge solely on the question whether tax credits are intangibles. In *Cottonwood Affordable Housing*, for example, the owner of a LIHTC project in Arizona challenged the county assessor's valuation of $2,121,859. Both sides agreed that the property should be assessed under the income approach, but disagreed on what types of income should be considered. The property owner thought the valuation should be based on the actual project income and expenses, while the county believed that either regular market rent rates should be used or the tax credits should be also considered. *Cottonwood Affordable Housing*, 72 P.3d at 359. The

court rejected use of the tax credits because they were intangibles, "not an integral part of the real estate", and added no "value [to] the property as their use is limited to ten years...." *Id.* On the restricted rents issue, the *Cottonwood Affordable Housing* court again agreed with the property owner: "A willing buyer, knowing that there is a restriction as to the amount of rent that can be charged, would pay less for a low income housing project than for a regular commercial apartment complex. This property should not be valued as though a buyer would not consider the restrictions." *Id.* at 360.

[¶ 16.] On the other hand, by way of diverse rationales, a number of courts have concluded that the restricted rents and the tax credits should both be factored in the assessment either because (1) the state has a broad definition of real property, (2) when only the reduced rents are considered, the value is artificially depressed, or (3) the value of the tax credits are part of the economic reality of the property. For instance, in *Rainbow Apartments v. Illinois Property Tax Appeal Bd.*, 326 Ill. App.3d 1105, 260 Ill.Dec. 875, 762 N.E.2d 534, 536–37 (2001), the court held that along with considering the restricted rents, "[i]gnoring the effect of the tax credits would distort the earning capacity, and thus the fair cash value, of the property as low-income housing." A willing buyer, the court reasoned, would surely consider the availability of the credits when determining the fair cash value of the property. *Id.* 260 Ill.Dec. 875, 762 N.E.2d at 537. Indeed, although valuation of tax credits can be complex, they are nonetheless transferable under the rules governing LIHTCs: "a purchaser of creditworthy property steps into the seller's shoes with respect to unused credits." [3] J. William Callison, *The Effect of Tax Credit Restrictions on Valuation for Real Property Tax Purposes*, 5 J

---

**3.** If the taxpayer originally qualifying for the

tax credits sells the property and the purchas-

AFFORDABLE HOUSING & CMTY DEV L 32 (1995) (citing 26 USC § 42(d)(7)).

[¶ 17.] Similar decisions can be found in several other states. In *Pine Pointe Housing, L.P. v. Lowndes County Bd. of Tax Assessors*, 254 Ga.App. 197, 561 S.E.2d 860, 863 (2002), the court examined a tax statute that required zoning, use restrictions, and "[a]ny other factors deemed pertinent," to be used to consider fair market value. LIHTC credits were deemed pertinent because

> [t]he credits have value to a taxpayer with federal income tax liability and can be "passed through" a partnership structure to those taxpayers.... [A] third party would pay for the value as part of that property's sale price in a bona fide, arm's length transaction. Furthermore, the tax credits go hand in hand with the restrictive covenants that require the property to charge below-market rent.

*Id.* at 863. Furthermore, included with the tax credits, the restricted rents should be considered because "[i]f viewed in isolation, the rental restrictions would artificially depress the value of the property for tax valuation purposes." *Id.*

[¶ 18.] Likewise, the court in *Parkside Townhomes Assoc. v. Bd. of Assessment Appeals of York County*, decided that LIHTC credits are properly included in a fair market value because the tax credits were "part of the economic reality." 711 A.2d 607, 611 (Pa.Commw.Ct.1998). "Tax related benefits associated with investment property ownership inherently affect value and the court is not constrained to determine [fair market value] as though the property lacked tax shelter features." *Id.* (citation omitted). *See also In re Ottawa Housing Assoc., L.P.*, 27 Kan.App.2d 1008, 10 P.3d 777 (2000) (both benefits and burdens of LIHTC housing should be considered). Furthermore, in *Spring Hill, L.P. v. Tennessee State Bd. of Equalization*, 2003 WL 23099679, *15–17 (Tenn.Ct.App. 2003) *Pine Pointe*, and *Rainbow Apartments, supra*, the courts specifically concluded that the tax credits are not intangible property.

[¶ 19.] For several reasons, we think South Dakota law allows for consideration of both the restricted rental rates and the tax credits for LIHTC properties. First, we need not grapple, as other courts have, with the troublesome question whether these tax credits are intangible property. Out-of-state cases holding that intangible property cannot be taxed are of no value here because, for taxation purposes, South Dakota makes no distinction between tangible and intangible property.[4] *Ewert v. Taylor*, 38 S.D. 124, 160 N.W. 797, 801 (1916). Second, South Dakota has a broad definition of real property that would encompass the tax credits: the definition includes the "[l]and and all rights and privileges thereto belonging[.]" SDCL 10–4–2. Third, the LIHTC program is a method for developers and owners to optimize their real estate investment.[5] *See Parkside Townhomes*, 711 A.2d at 611. To

---

er continues the low income use, the purchaser can assume the tax position of the seller under 26 USC § 42(d)(7)(A). In some instances, appraisers will use the present value of the tax credits in valuing the property.

4. Even if these tax credits could be designated as intangible property, a distinction can be made between taxing intangible property and considering such credits as a value increasing feature.

5. An argument that the tax credits cannot be considered because these benefits ultimately go to one or more of Town Square's partners and not Town Square itself would be of no merit. "The deed restrictions create financial benefits, and these benefits cannot be ignored simply because they pass through to the partners...." *Pedcor Investments*, 715 N.E.2d at 438.

ignore these credits, which enhance value, would be to ignore the realities of the marketplace. Buyers and sellers most certainly consider the benefits and restrictions that come with LIHTCs in determining the market value of real estate. *See Pedcor Investments v. State Bd. of Tax Comm'rs,* 715 N.E.2d 432, 437 (Ind.Tax 1999) (tax incentives provide financial benefits counteracting the decreased rental income). Surely Town Square would never have agreed to a covenant requiring forty years of restricted rents without the accompanying benefit of the tax credits. *Accord Kankakee County v. Property Tax Appeal Bd.,* 131 Ill.2d 1, 136 Ill.Dec. 76, 544 N.E.2d 762, 767, 769 (1989); *Glenridge Dev. Co. v. City of Augusta,* 662 A.2d 928, 931 (Me.1995); *Meadowlanes Ltd. Dividend Housing Ass'n v. City of Holland,* 437 Mich. 473, 473 N.W.2d 636, 649 (1991). As we indicated, to the extent that they have not been used, these tax credits are transferable to new buyers.

[¶ 20.] Despite compelling reasons for valuing both the tax credits as well as the reduced rent restrictions, we must still address this Court's ruling in *Yadco.* That decision rejected a taxpayer's argument that his property should be appraised using the income approach because he had granted an uneconomical long-term lease on the property. The Court declined this position because "the taxpayer's income approach distorted the result by employing actual income from the lease...." *Yadco,* 237 N.W.2d at 670 (citations omitted). "[T]he county and the state should not be forced to bear the burden of increased taxation merely because a taxpayer, intentionally or through poor business judgment, has consummated a long-term, uneconomical lease." *Id.* at 658. Thus, the

case instructs us that a property owner can reduce a property's value by imprudently agreeing to rental restrictions with consequent economic loss, but the owner should not be allowed to reduce the tax valuation in such a manner.

[¶ 21.] We find *Yadco* to be distinguishable. Considered in isolation, reduced rental restrictions would negatively affect the income-producing capacity of the apartment complex and thus its value. But here the agreement to maintain the reduced rents under a restrictive covenant allows Town Square to take advantage of substantial federal tax incentives. These incentives provide financial benefits to Town Square's partners, thus offsetting the decreased rental income.[6] With tax credits allocated to the property, its marketable value increases. Unlike in *Yadco,* Town Square's investors have not intentionally or imprudently diminished the value of the property. They have financed and developed a low income apartment complex that may have otherwise not been economically feasible.

## Conclusion

[¶ 22.] The central issue here is whether the restricted rents imposed on Town Square's building and the federal tax credits enjoyed by the owners affect the value of the property. Those tax credits make ownership of the property more desirable. And because the tax credits can be transferred to purchasers, they enhance the value of the property in the marketplace. We conclude that in assessing this property for property tax purposes, both the tax credits and the restricted rental rates must be considered. In endorsing these considerations, we find nothing inconsistent with our relevant constitutional and statutory provisions. Because the ulti-

---

6. We do not know to what degree the reduced rents and the tax credits offset each other. That is why it would probably be inappropri-ate to simply ignore both components in an assessment.

mate valuation here failed to consider both the restricted rents and the tax credits, we reverse and remand.[7] In view of our ruling, we need not decide the discretionary formula question.

[¶ 23.] Reversed and remanded.

[¶ 24.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.

7. Because we reverse the circuit court's approval of Shaykett's appraisal, it does not mean that we endorse LeGrand's appraisal. Neither appraiser used both the reduced rents and the tax credits in their computations.